**UNITED STATES of America**

v.

**Leetavious GAINES and Bogard Liddell, Defendants.**

**No. 96–6159–CR.**

United States District Court, S.D. Florida.

Oct. 3, 1997.

Andrea M. Simonton, Asst. U.S. Atty., Miami, FL, for U.S.

Gary Robert Fine, Howard J. Schumacher, Ft. Lauderdale, FL, for defendants.

### MEMORANDUM OPINION AND ORDER ON ADMISSIBILITY OF PCR–BASED DNA ANALYSIS

GOLD, District Judge.

### I. INTRODUCTION

The United States of America (hereinafter "the Government") filed a motion for a pretrial determination of the admissibility of the results of DNA analysis performed by the FBI laboratory. Defendant Liddell moved to exclude the DNA analysis claiming it was untimely.[1] Thereafter, Defendant Liddell re-

---

1. To the extent Defendant Liddell's motion to exclude based on timeliness was not ruled upon

quested funds to appoint an expert who could review the DNA analysis and assist Liddell's counsel prior to, and at, trial. The Court approved the expenditure of funds by order dated June 17, 1997.

By order dated August 28, 1997, the Court required the Government to make the requisite showing under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (hereinafter "*Daubert*") as a precondition to the admissibility of expert testimony regarding the Polymerase Chain Reaction ("PCR") DNA analysis performed in the case. A *Daubert* hearing was found to be particularly appropriate since the Eleventh Circuit Court of Appeals has not rendered any opinion permitting federal district courts to take judicial notice of the reliability of PCR (or any other) DNA-based analysis.

In accordance with *Daubert*, the Court heard testimony from the Government's experts, Melissa Smrz, with the FBI's DNA Analysis Unit, and Dr.Martin Tracey, a biologist with an expertise in DNA and population genetics, concerning (1) whether the PCR DNA based analysis, consisting of sample processing, match determination, and random match probability, is based upon reliable scientific knowledge, and (2) whether it will assist the trier of fact. *Id.* at 591–93, 113 S.Ct. at 2796. The Defendants presented no expert testimony, but, argued instead by memoranda, that the evidence presented was insufficient to satisfy the *Daubert* standards.

Contrary to the Defendants' position, the Court previously has concluded that the reasoning and methodology underlying the PCR DNA based analysis performed in this case is scientifically valid and would assist the jury in determining a fact in issue (the identity of the robber), and, therefore, the Court held, prior to the commencement of trial, that it was admissible under Fed.R.Evid. 702. Accordingly, the Court permitted expert testimony as to each aspect of the PCR DNA based analysis conducted with respect to Defendant Liddell and the bandanna referred to as Q10, but limited testimony as against Defendant Gaines. The substance of the testimony allowed was that Gaines could not be excluded as a potential contributor of DNA.

by prior court order, it is hereby denied.

By stipulation, the Government agreed that it would not offer testimony regarding whether Gaines was a major or minor contributor of the DNA, and it would not attempt to quantify the random match probabilities between Gaines and the DNA profile in the comparison population. This memorandum opinion sets forth the basis for the Court's ruling.

## II. FACTS

The superseding indictment charges Defendants Bogard Liddell and Leetavious Gaines with the commission of six armed robberies between August 20, 1997, and August 30, 1997, and with conspiracy to commit these robberies. The DNA analysis in this case relates solely to the robbery charged in Count 10 of the superseding indictment. In that count, the Defendants are charged with robbing the McDonald's at 13200 State Road 84 in Davie, Florida, on August 27, 1996. At the time of the robbery, the lobby was closed and the doors were locked. The perpetrators entered the McDonald's via the drive-thru window. One of the perpetrators was wearing a dark ski mask and the other was wearing an orange ski cap. After the robbery, a witness noticed a black bandanna outside the drive-thru window, which had not been there shortly before the robbery. This bandanna was seized by Davie police Detective Tony Phillips. A dark ski mask and an orange ski cap, along with two firearms and a BB gun, were subsequently found in a bag at the apartment of Cassandra Jackson, a friend of Gaines. Ms. Jackson advised police that Gaines had left the bag at her apartment. Another black ski mask was found at the residence of defendant Gaines and his family.

The bandanna, ski masks and ski cap, among other item, were sent to the FBI laboratory for analysis. The laboratory assigned these items the following numbers;

Q3 Black Ski Mask from Gaines' residence.

Q5 Red Ski Cap from Jackson's apartment.

Q6 Black Ski Mask from Jackson's apartment.

Q10 Black Bandanna from McDonalds.

The laboratory was also sent known blood samples taken from Defendants Bogard Liddell and Leetavious Gaines, and from Terrence Gaines, the brother of Leetavious who resided with him at the Gaines residence. These known samples were numbered as follows:

K2 Terrace Gaines

K5 Leetavious Gaines

K8 Bogard Liddell

The DNA analysis was performed by Supervisory Special Agent Melissa Smrz, using the Polymerase Chain Reaction (PCR) technique, in three separate testing procedures [Polymarker (PM), DQA1 and D1S80] to examine seven different polymorphic loci (LDLR, GYPA, HBGG, D7S8, Gc), and D1S80. In addition, the FBI used amelogenin typing results to determine that male DNA was detected in all known samples, as well as Q10 (the bandanna). Her analysis, dated May 20, 1997, was entered into evidence as Government's Exhibit 117. In brief, the results were as follows:

The bandanna seized from the McDonalds contained sufficient DNA for analysis, and Bogard Liddell was identified as a potential source of this DNA. The probability of selecting an unrelated individual at random having the same DNA types as detected on the bandanna is approximately 1 in 6.1 million in the Black population, 1 in 67 million in the Caucasian population, 1 in 110 million in the Southeastern Hispanic population, and 1 in 170 million in the Southwestern Hispanic population.

With respect to Q5, the red ski cap, no conclusive typing results were obtained. The remaining items contained DNA from more than one individual. Therefore, no probabilities were calculated. The analysis of the black ski mask removed from the Gaines residence, Q3, showed that Terrace Gaines could not be excluded as a major contributor to the DNA. The typing results of the minor contributor were inconclusive; however, a source of DNA other than Bogard Liddell and Leetavious Gaines was present.

The analysis of the black ski mask from Jackson's apartment, Q6, indicated the presence of DNA from more than one individual. The report concluded that, because of these mixtures, no conclusive typing results were obtained, but that Leetavious Gaines could not be excluded as a contributor to the DNA.

## III. ADMISSIBILITY OF DNA EVIDENCE

### A. BASIC CONCEPTS OF DNA—AN OVERVIEW

The following is a basic description of DNA[2] as set forth by Judge Barbadoro in his memorandum opinion in *United States v. Shea*, 957 F.Supp. 331, 333 (D.N.H.1997):

DNA, an acronym for deoxyribonucleic acid, is the chemical blueprint for life. Most human cells other than reproductive cells contain identical copies of a person's DNA. Although 99.9% of human DNA does not vary from person to person, no two persons other than identical twins have the same DNA. (citation omitted).

Human DNA is organized into 23 pairs of chromosomes and each chromosome contains a DNA molecule. DNA molecules have a double stranded helical structure that can be envisioned as a spiral staircase. (citation omitted). Running between the two sugar-phosphate strands forming the handrails of the staircase are millions of steps comprised of two loosely bound nitrogen bases. Each step is referred to as a base pair. There are four types of bases: adenine (A), thymine (T), guanine (G), and cytosine (C). A's ordinarily pair only with T's, and C's ordinarily pair only with G's. Thus, if the sequence of bases on one side of a DNA molecule is known, the corresponding sequence of bases on the other side can be deduced. The arrangement of base pairs in chromosomal DNA comprises the genetic code that differentiates humans from non-humans and makes every person unique. (citation omitted)

In total, the DNA molecules in the 23 pairs of human chromosomes contain ap-

---

**2.** The description quoted is consistent with the expert testimony of Melissa Smrz and Dr. Martin Tracey.

proximately 3.3 billion base pairs. Most of the base pairs are arranged in the same sequence in all humans. (citation omitted) However, every DNA molecule has regions known as polymorphic sites where variability is found in the human population. (footnote omitted) Each possible arrangement of base pairs that occurs at a polymorphic site is referred to as an allele. Alleles can result from differences in a single base pair, differences in multiple base pairs, or differences in the number of base pairs that comprise a site.

The combination of alleles from corresponding sites on a chromosome pair is sometimes referred to as the site's genotype. (footnote and citation omitted). One allele for each single locus genotype is inherited from each parent. If both parents contribute the same type of allele, the child's genotype is considered to be homozygous. If each parent contributes a different type of allele, the child's genotype is considered to be heterozygous. To illustrate, if only two alleles for a locus are found in the population, A and a, two homozygous genotypes, AA and aa, and one heterozygous genotype, Aa, will be found in the population. Although an individual's genotype consists of either two copies of the same allele or one copy of each of two different alleles, many different alleles may be found in the population for a single locus. (citation omitted)

## B. THE PCR METHOD OF DNA ANALYSIS.

The PCR method of DNA analysis has been succinctly described in *United States v. Beasley*, 102 F.3d 1440, 1445 (8th Cir.1996), where the Eight Circuit quoted (and adopted) Judge Doty's findings which were rendered following a *Daubert* hearing. The quoted findings provide: [3]

The PCR method [of DNA analysis] is based upon the natural DNA replication process. By utilizing the PCR method, one can produce a substantial number of specific segments of human DNA which can then be typed. Because 99 percent of the DNA molecule is the same for every individual, the DNA segments amplified for purposes of PCR DNA typing are ones which exhibit genetic variation within the population. These variations provide the basis for DNA typing.

The PCR method recognizes that the base pairs along the DNA molecule are joined by hydrogen bonds which can be broken by heating. When exposed to heating, the two complementary strands of DNA separate or "denature." Because the bases on a DNA strand are always complementary, a denatured DNA strand forms a template that allows the manufacture of a new strand that is identical to the former complementary strand. This denatured strand is then exposed to two synthetic primers, each complementing a sequence at one end of the target sequence and which bind with their complementary sequences on the separated strands. One of a type of enzymes called polymerase can be used to attach a free nucleotides [sic] to the end of the primer. Because the nitrogenous bases of nucleotide pairs are always (reference omitted) complementary, the nucleotide that is added to the end of the primer is necessarily complementary to the nucleotide on the sample DNA strand bound to the primer. Polymerase then adds another nucleotide to the nucleotide that has just been added. The second nucleotide is necessarily complementary to the next nucleotide on the sample strand. Repeated additions of free nucleotides continue until a new strand of the targeted DNA-sequence is created. The new strand is complementary to the sample strand, and thus identical to the other denatured strand of the original DNA sample.

The replication process can be repeated by reheating the sample to again cause denaturation and with each new cycle, the DNA replicated grows exponentially. Eventually, the amplification produces a sufficient quantity of a relatively pure sample for an

---

**3.** Another excellent discussion of the PCR method of DNA testing is stated in *United States v. Hicks*, 103 F.3d 837, 844–845 (9th Cir.1996). The testimony of Melissa Smrz and Dr. Martin Tracey is consistent with the general findings set forth in both opinions.. These findings are set forth *infra* in Part E of this Memorandum Opinion, entitled, "Application of the *Daubert* factors to the Evidence".

investigator to determine the gene type of the sample. In the forensic setting, one DNA sequence or locus commonly examined after PCR amplification is the human leukocyte antigen (HLA) protein system and, in particular, the DQ<<alpha>> gene. Other additional DNA loci which are tested using the Polymarker test kit include the following: low density lipoprotein (LDLR), glycophorin (Delta) (GYPA), hemoglobin G gamma globin (HBGG), D7S8 and group-specific component (Gc). By performing the DQ<<alpha>> test and the Polymarker test on a DNA sample recovered from a crime scene, a DNA profile is determined.

The second phase of the PCR method of DNA typing involves comparing the DNA profile from the unknown source with the DNA profile of a known source from a possible suspect. If the profiles are different the suspect is excluded. However, if the profiles match a question is raised as to the frequency with which such a profile occurs in the population. Based upon a population database developed by the BCA, the frequency with which an individual allele occurs in the comparison population is determined. These individual probabilities are then multiplied to produce a frequency of the DNA profile in the comparison population.

## C. JUDICIAL RECOGNITION OF PCR DNA ANALYSIS.

The first two federal circuit courts to consider the question of the scientific reliability of PCR DNA based analysis have readily found that it satisfies the standards established by *Daubert*. In *United States v. Beasley*, 102 F.3d 1440 (8th Cir.1996), the Eighth Circuit held that "[t]he reliability of the PCR method of DNA analysis is sufficiently well established to permit the courts of this circuit to take judicial notice of it in all future cases." *Id.* at 1448.

In *Beasley*, the defendant claimed that the District Court erred by admitting DNA evidence of two hairs found in a ski mask used in a robbery. Before trial, the district court conducted a *Daubert* hearing concerning the admissibility of the DNA evidence using the PCR method of DNA typing and entered extensive finding as quoted above. Upon appeal, the Eight circuit held that the district court had carefully considered the *Daubert* factors in its assessment of the reliability of the PCR method and rejected the appellant's (defendant) claim that PCR testing does not meet the *Daubert* standard of reliability. It added, however, that "[I]n every case, of course, the reliability of the proffered test results may be challenged by showing that a scientifically sound methodology has been undercut by sloppy handing of the samples, failure to properly train those performing the testing, failure to follow appropriate protocols, and the like." *Id.*

The Eighth Circuit recognized that, while it appeared to be the first federal court of appeals to examine the PCR method of DNA typing, a number of state appellate courts have examined the PCR method. It found that the vast majority of them have sustained the admission of DNA evidence derived from the PRC method.[4]

---

4. The state appellate courts that have found PCR DNA testing to be scientifically reliable, and admissible in criminal cases, number at least twenty. *See Seritt v. State*, 647 So.2d 1, 4 (Ala.Crim. App.1994); *Harmon v. State*, 908 P.2d 434, 442 (Alaska.Ct.App.1995); *People v. Amundson*, 41 Cal. Rptr.2d 127, 135 (Cal.App.4th 1995); *People v. Groves*, 854 P.2d 1310 (Colo.Ct.App.1992); *Redding v. State*, 219 Ga.App. 182, 464 S.E.2d 824, 828 (1995); *State v. Hill*, 257 Kan. 774, 895 P.2d 1238, 1247 (1995); *State v. Spencer*, 663 So.2d 271, 275 (La.App.1995); *People v. Lee*, 212 Mich.App. 228, 537 N.W.2d 233, 257–58 (Mich. App.1995) ("[T]rial courts in Michigan may take judicial notice of the reliability of DNA testing using the PCR method."); *State v. Grayson*, 1994 WL 670312 (Minn.Dist.Ct.); *State v. Hoff*, 904 S.W.2d 56, 59 (Mo.Ct.App.1995); *State v. Moore*, 268 Mont. 20, 885 P.2d 457, 474–75 (1994), overruled on other grounds, *State v. Gollehon*, 274 Mont. 116, 906 P.2d 697 (1995); *State v. Williams*, 252 N.J.Super. 369, 599 A.2d 960, 968 (1991) ("[H]ighly qualified Scientists testified at the overwhelming acceptance within the Scientific community of PCR-applied DNA testing."); *People v. Palumbo*, 162 Misc.2d 650, 618 N.Y.S.2d 197, 201 (Kings Co.1994); *State v. Penton*, 1993 WL 102507, *5 (Ohio App. 3 Dist.); *State v. Lyons*, 124 Or.App. 598, 863 P.2d 1303, 1311 (1993); *State v. Moeller*, 548 N.W.2d 465, 1996 SD 60 (1996); *Campbell v. State*, 910 S.W.2d 475, 479 (Tex.Crim.App.1995), cert. denied, —— U.S. ——, 116 S.Ct. 1430, 134 L.Ed.2d 552 (1996); *State v. Begley*, 1996 WL 12152 (Tenn.Crim.App.); *Spencer v. Commonwealth*, 240 Va. 78, 393 S.E.2d 609, 620–21 (1990)("The

In *United States v. Hicks,* 103 F.3d 837 (9th Cir.1996), the Government's expert proposed to testify that, as a result of a PCR DNA testing procedure, none of the three perpetrators could be excluded as a contributor to the sample. The Defendant objected, and the trial court held a *Daubert* hearing after which the PCR results were admitted under Fed.R.Evid. 702 and 403. Upon appeal, the Ninth Circuit concluded that, although PCR forensic testing is relatively new to the federal appeals courts, "... its novelty should not prevent the district court from exercising its sound discretion in admitting such evidence once a proper *Daubert* showing has been made." *United States v. Hicks, supra,* 103 F.3d at 846–47.

PCR DNA analysis has been accepted in two recent federal district court opinions. In *United States v. Shea, supra,* 957 F.Supp. 331, the district court judge was so convinced of the admissibility of PCR tests, that he concluded that courts could take judicial notice of their general reliability. Specifically, the Court concluded:

> PCR is a scientifically sound technology that can be extremely helpful in resolving questions of guilt or innocence. The theory and techniques used in PCR are sufficiently established that court may take judicial notice of their general reliability. See *Beasley,* 102 F.3d at 1448 (taking judicial notice of general reliability of PCR testing); see also *United States v. Martinez,* 3 F.3d 1191, 1197 (8th Cir.1993) (taking judicial notice of general reliability of DNA testing), cert. denied, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994); [*U.S. v.*] *Jakobetz,* 955 F.2d [786] at 799 [(2nd Cir.1992)] (taking judicial notice of reliability of DNA testing). The PCR tests used in this case readily satisfy Rule 702's reliability requirement. Accordingly, disputes concerning the way in which the tests were conducted, while vitally important, are matters that should be left for the jury to resolve.

Random match probability estimates calculated with the product rule provide an important means of placing the significance of a DNA profile match in an appropriate context. However, such estimates must be qualified to account for potential errors such as in the manner suggested by the NRC II report. The government satisfied this requirement. When the significance of a random match probability estimate is properly explained, the probative value of the evidence is not substantially outweighed by the limited potential that jurors could be misled. 957 F.Supp. at 345–46.

In *United States v. Lowe,* 954 F.Supp. 401 (D.Mass.1996), Judge Saris conducted an extensive *Daubert* hearing to consider the admissibility of DNA profiles obtained with PCR analysis. In that case, the defendant, as here, challenged its admission on the grounds that two of three PCR tests conducted—the Polymarker and D1S80—have not been adequately validated through scientific testing and the peer review process, and were not generally accepted. In his memorandum opinion, Judge Saris, after considering each of the factors set forth in *Daubert,* denied the defendant's motion to exclude the PCR DNA evidence. In concluding that the Government had established the scientific validity, and thus the evidentiary reliability, of the tests and techniques employed in the PCR-based DNA analysis, Judge Saris relied on the testimony of the forensic examiner at the FBI's DNA Analysis Unit, and Dr. Martin L. Tracey, a biologist with an expertise in DNA and population genetics (who also testified in this case). This Court finds Judge Saris' analysis to be extremely persuasive.

Significantly, in both *United States v. Shea, supra,* and *United States v. Lowe, supra,* the federal district courts found that the PCR methodology and the same genetic markers as used in this case had been vali-

---

[PCR] theory was conceived about ten years ago and has become one of the most widely-used technical procedures in molecular biology since 1985, being used in many diagnostic applications having 'life or death' implications."); *State v. Russell,* 125 Wash.2d 24, 882 P.2d 747, 768 (1994) ("We see no question that the principles and methodology underlying PCR at the DQ al-

pha locus have been generally accepted by the Scientific community."). The Oregon Supreme Court in *State v. Lyons,* 324 Or. 256, 924 P.2d 802, 813–14 (1996), cited numerous state appeals courts that have approved the admission of PCR evidence. Regarding peer review, the Supreme Court cited a bibliography listing over 4,000 scientific articles and publications relating to PCR.

dated for forensic DNA analysis. In reaching these results, both courts relied on the findings of the National Research Council of the National Academy of Sciences in its report entitled, *The Evaluation of Forensic DNA Evidence* (1996) (hereinafter "1996 NRC Report II") (Ex. 6 Government's Memorandum in Support of Admissibility). With respect to the forensic use of PCR-based test evidence, the Committee noted that it had been introduced in a substantial number of cases, and judges, with few dissenters, have held that PCR-based techniques were sufficiently reliable to establish matches between samples. 1996 NRC Report at 177–78.[5] In *Lowe*, the court quoted from that part of the 1996 NRC Report which states that PCR tests are "thoroughly sound and . . . the results are highly reproducible when appropriate quality control methods are followed." *Id.* at 417.

### D. ENUMERATION AND APPLICATION OF DAUBERT FACTORS.

■ *Daubert* sets forth the criteria for determining whether expert scientific evidence is admissible at trial. A district court confronted with a proffer of expert testimony must at the outset, pursuant to Fed.R.Evid. 104(a) and 702, determine whether the expert is proposing to testify about "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796. "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. at 2795. Among the non-exclusive factors that a court should consider in determining whether scientific testimony is reliable are: (1) whether the expert's opinion can be or has been tested; (2) whether the theory or technique on which the opinion is based has been subjected to peer review and publication; (3) the technique's known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operations; and (5) "general acceptance." *Daubert*, 509 U.S. at 593–94, 113

S.Ct. at 2796–97. No single factor is necessarily dispositive in this analysis and other factors might also warrant consideration in the appropriate case. *Daubert*, 509 U.S. at 594, 113 S.Ct. at 2797.

### E. APPLICATION OF DAUBERT FACTORS TO THE EVIDENCE

■ Simply stated, PCR DNA based analysis involves three components—sample processing, match determination and random match probability. Each component is considered separately below under the criteria enumerated in *Daubert*.

### I. SAMPLE PROCESSING

#### A. The PCR Method of DNA Analysis Has Been Tested

Under *Daubert*, the first step in determining the scientific validity of a theory or technique is whether it can be or has been tested. All the samples in the case were processed using the PCR method. All sampling was performed in accordance with the FBI Laboratory protocol. The PCR process is approximately 10 years old, and has undergone extensive testing. The process was applied first to amplify the DQA1 genetic marker, and later was applied, in approximately 1994, to amplify the five genetic markers analyzed in the Polymarker ("PM") test and, shortly thereafter, the D1S80 genetic marker. The underlying premise upon which PCR is based is that an amplification process can be used to make many identical copies of selected portions of the DNA molecule, i.e., genetic markers, and that the resulting product can be used to determine the existence of particular types of alleles of those genetic markers.

Based on the expert testimony, the Court finds that the PCR method of analysis for these genetic markers had been tested extensively, and, when the FBI Protocol is followed, the analysis consistently generates true results. The validation studies contained in Government Exhibits 120, 121 and

5. In 1996 NRC Report II, the Committee concludes:

DNA analysis is one of the greatest technical achievements for criminal investigation since the discovery of fingerprints. Methods of DNA profiling are firmly grounded in molecular technology. When profiling is done with appropriate care, the results are highly reproducible. In particular, the methods are almost certain to exclude an innocent suspect. NRC II at 73.

122, as well as the references contained in the FBI Protocol (Government Exhibit 116) support this conclusion. Neither expert was aware of any published authority to the contrary. With respect to the amelogenin test, the Court finds that it had been widely tested and is universally accepted without contradiction.

### B. The PCR Method of Analysis Has Been Subjected to Peer Review and Publication

The PCR Method of Analysis for each of the genetic markers used to detect differences in this case has been the subject of numerous published articles which confirm the validity of their use for this purpose.[6] In its first report in 1992, the Committee on DNA Technology in Forensic Science, established by the National Research Council (Ex. 5 Government's Memorandum in Support of Admissibility) (hereinafter, "1992 NRC Report") recognized:

> One key technique introduced in the last few years is the polymerase chain reaction (PCR), which allows a million or more copies of a short region of DNA to be easily made. For DNA typing, one amplifies (copies) a genetically informative sequence, usually 100–2,000 nucleotides long, and detects the genotype in the amplified product....
> 
> The PCR process ... is simple; indeed it is analogous to the process by which cells replicate their DNA. It can be used in conjunction with various methods for detecting person-to-person differences in DNA.

National Research Council, DNA Technology in Forensic Science (1992) at 5–6.

In its 1996 Report, the NRC II Committee (Ex. 6 Government's Memorandum in Support of Admissibility) reiterated this conclusion, and stated that "it is not surprising that PCR-based typing is widely and increasingly used in forensic DNA laboratories in this country and abroad." The increased use was based upon the fact that the process was relatively simple and could be easily carried out within a short period of time, and that PCR-based methods usually permit an exact identification of each allele, in which case there are "no measurement uncertainties." National Research Council, The Evaluation of Forensic DNA Evidence (1996) at 70.

### C. The PCR Method of Analysis Has an Acceptable Rate of Error and There are Standards Which Control the Technique's Operation

The third factor identified in *Daubert* is the known or potential rate of error for the particular scientific technique, and the existence and maintenance of standards controlling the technique's operation. The FBI has an established protocols which it follows in performing the PCR-based analysis of the DQA1, PM, D1S80 and Amelogenin genetic markers. (Government's Exhibit 116). Dr. Tracey testified that he was familiar with the current Protocol, as well as its two predecessors, and that it used the same processes and techniques that were generally accepted in the scientific community. The protocol sets forth the principles upon which the DQA1, PM, D1S80 and Amelogenin typing tests are based, and which were explained by SSA Smrz in her testimony. (Government's Exhibit 116, Section 1). The protocol also contains specific citations to the published scientific literature concerning amelogenin, D1S80, DQA1, PM, DNA Extraction, DNA Quantitation, and Polymerase Chain Reaction procedures. It sets forth the reagents and supplies which are to be used in performing the analysis. (Government's Exhibit 116, Section 2). It contains special quality control measures, including cleaning, calibration, and verification to ensure that the equipment is operating properly; and, the use of positive controls and blank controls designed to detect any contamination and to ensure that the

---

**6.** An appellate court in California noted that the forty-five articles offered by the prosecution regarding PCR analysis, "many of which are published in peer-reviewed journal, describe forensic applications of PCR testing, its successful performance and its reliability in forensic identification." *People v. Amundson*, 41 Cal.Rptr.2d 127, 133 (Cal.App.4th 1995) (citations to peer-reviewed journals are omitted). As noted *supra*, numerous other courts have recognized that "hundreds of scientific articles endorsing the use of PCR analysis for forensic purposes have been published. See *State v. Russell, supra*, 882 P.2d at 766; *State v. Lyons*, 124 Or.App. 598, 863 P.2d 1303 (1993); *State v. Williams*, 252 N.J.Super. 369, 599 A.2d 960 (1991).

equipment functioned properly during the particular analysis being performed at that time. (Government's Exhibit 116, Section 3). It provides that the extraction procedures, which involve small quantities of DNA occur in a separate work area from the area where the amplification process occurs. (Government's Exhibit 116, Sections 4 and 6). It also specifies that extracts of known samples and questioned samples are to be prepared at different times to avoid contamination. (Government's Exhibit 116, Section 4).

All FBI examiners and technicians receive extensive training before being permitted to conduct forensic analyzes in real cases. In addition, they undergo both open and blind proficiency testing on a regular basis. Open proficiency tests are conducted by an independent laboratory, Cellmark in London, England. Dr. Tracey testified that he was familiar with some of the proficiency tests that had been performed on FBI agents and examiners in other laboratories, and that all of the FBI proficiency tests with which he was familiar were error-free. With respect to the overall error-rate, he estimated that it was less than one-percent (1%). Dr. Tracey testified that it would be very difficult to establish a laboratory error rate due to the large number of proficiency tests that would have to be performed in order to obtain a statistically valid rate. This would result in examiners spending a large portion of their time taking tests instead of conducting forensic examinations. The 1996 NRC Report reaches the same conclusion:

> It is difficult to arrive at a meaningful and accurate estimate of the risk of such laboratory errors. For one thing, in this rapidly evolving technology, it is the current practice and not the past record of a laboratory that is relevant, and that necessarily means smaller numbers and consequent statistical uncertainty. For another, the number of proficiency tests required to give an accurate estimate of a low error rate (and it must be low to be acceptable) is enormous and would be outlandishly expensive and disruptive. We believe that such efforts would be badly misplaced and would use resources that could much bet-

ter be used in other ways, such as improving laboratory standards.

*Id.* at 24–25.

### D. The Method of Sample Processing is Generally Accepted Within the Scientific Community

Although in *Daubert*, the Supreme Court rejected the test of "general acceptance" as the *sine qua non* of admissibility, the Court nevertheless recognized that this was an important factor to be considered in the totality of the circumstances. Here, the Court finds, based on the expert testimony, that the PCR-based methods of sample processing is generally accepted within the scientific community of forensic geneticists. This also is demonstrated by the proliferation of articles with respect to each of the genetic markers involved in this case, and the absence of any published literature which contradicts the use of these methods of sample processing.

## II. MATCH DETERMINATION

The next critical inquiry is whether the process for determining a match is scientifically valid and produces reliable results. The genetic markers used in the subject PCR DNA based analysis were chosen because they are polymorphic, that is, there are different forms of these markers located at the same site. As described by Dr. Tracey, one of the most common examples of this is eye color—some people have a gene or genetic marker for blue eyes, others have the genetic marker for brown eyes. These different forms are called alleles. A comparison of the alleles in known and questioned samples can be used to either exclude or include the person in the known sample as a potential source of the DNA found in the questioned sample. At the DQA1 site, there are 7 forms of alleles. The PM test involves five different genetic markers which each have either two or three alleles. DQA1 and PM alleles are identified by the sequence of the bases in the DNA molecule at the designated site or locus (i.e., DQA1, LDLR, GYPA, HBGG, D7S8, or Gc). The forms or alleles of the D1S80 genetic marker are based on the number of times that the known sequence of the 16 bases located at that site

are repeated. The alleles identified at this site vary from 14 through 41 repeats, and a separate allele is used for greater than 41 repeats.

For DQA1 and PM, the process used for determining a match involves the use of the reverse dot blot test. For D1S80 and Amelogenin, the process used is gel electrophoresis. Since the processes are different, they will be addressed separately.

## DQA1 AND PM

The match determination for DQA1 and PM is made by using the reverse dot blot technique. In this technique, the sample to be tested is applied to a test strip which contains DNA segments with complementary sets of bases. A dye is applied to the test strip so that a blue dot will appear when if the sample DNA binds with, that is matches, a specific allele on the test strip. A control dot, marked "C" on the DQA1 test strips, and "S" on the PM test strips, is used as a standard to determine if sufficient quantities of DNA were present to enable a reliable match to be declared. A match cannot be declared unless there is a visible control dot, and the intensity of the test dot is equal to or greater than the intensity of the control dot.

A. *The Match Determination Method Used to Analyze DQA1 and PM Alleles Has Been Tested*

The Court finds, based on the expert testimony, that the reverse dot blot method of determining a match for DQA1 and the five PM loci had been extensively tested and determined to be reliable. The testimony is supported by the validation studies contained in Government Exhibits 120 and 121. The validation studies tested the ability of examiners to correctly identify matches based on this method. Both experts testified that the validation studies confirm that, given the use of the control dot as a standard, there was no need to use other scientific methods to determine the intensity of the color of the test dot. The Court finds that the DQA1 and PM tests were designed to be reliable *without* the use of expensive additional equipment, and had been validated for use based upon visual examination of the dots.

B. *The Match Determination Method Used to Analyze DQA1 and PM Has Been Subjected to Peer Review and Publication*

The tests conducted to determined the validity and reliability of the reverse dot blot method for determining matches has been published in peer-reviewed literature. No published articles were brought to the Court's attention which found this method to be scientifically invalid.

C. *The Match Determination Method Used to Analyze DQA1 and PM Has an Acceptable Rate of Error, and There are Standards Which Control the Technique's Operation*

The expert testimony substantiates that the operation of this technique is performed according to a standard protocol. The FBI Protocol sets forth the standards to be used in determining a match using the reverse dot blot method of analysis. (Government's Exhibit 116, Section 8). It specifically requires that a control dot be used to determine whether a match can be declared, and provides for the use of blanks to detect contamination. The proficiency tests discussed above establish that there is an acceptable rate of error, since in addition to determining the reliability of the sample processing, they necessarily also examine the accuracy of the match determination. In addition, each examiner's conclusions in the FBI laboratory is independently confirmed by a second examiner.

D. *The Match Determination Method Used to Analyze DQA1 and PM is Generally Accepted Within the Scientific Community*

Based on the expert testimony, the Court finds that the reverse dot blot method of determining matches is generally accepted within the scientific community. Neither expert was aware of any published literature which disputed the scientific validity of this method. To the contrary, the reverse dot blot technology is widely used by other forensic DNA laboratories throughout the country.

### E. *Mixtures*

The expert testimony establishes that the above methods have been generally accepted within the scientific community for the purpose of identifying mixtures of DNA, also referred to as mixed samples. The 1996 NRC Report also recognizes the detection of alleles in mixed samples, and provides guidelines for the statistical analysis of such samples. 1996 NRC Report at 129–30, 162–65. A mixture is detected when there is a dramatic difference in the intensity of the dots with respect to alleles detected for a particular marker, or if there are more than two alleles detected for a particular marker. The difference in intensity results from the fact that with respect to each strip, there is the same amount of complementary DNA present, so that the intensity of alleles detected should be the same. As Dr. Tracey explained, if a genetic marker has an "A" allele and a "B" allele, and both dots are present in the same intensity, it indicates that there is only one form of the marker present. However, if there is a very dark "A" allele and a much lighter "B" allele, it indicates that there is a mixture, since any one person's DNA will contain equal amounts of alleles for the same marker. Likewise, if there are three forms of the allele, for example an "A," "B," and a "C," and all are detected, there is necessarily more than one person's DNA present because each person has only two alleles for each genetic marker—one inherited from the mother and one inherited from the father. Therefore, an individual could be positively excluded as the source of DNA if the individual had alleles that were not detected in the mixed sample. If, however, the alleles present in the mixture were the same as that individual, he or she could not be excluded as a potential contributor of that DNA.

### D1S80 AND AMELOGENIN

The match determination for the D1S80 and Amelogenin genetic markers is made by using the gel electrophoresis process. For Amelogenin, the genetic marker for males is identified if two bands appear, and the genetic marker for females is identified by one band. Without contradiction, the expert testimony established that this procedure has been tested; it has been the subject of peer-reviewed literature; the result has been easy to read, and it has been universally accepted for both forensic and medical purposes.

The electrophoresis process involves the use of a gel on which the DNA sample is placed. As noted above, the D1S80 genetic marker contains alleles which vary in the number of times the sequence of bases is repeated. Tests have determined that the D1S80 alleles, which contain the most number of repeats, travel more slowly through the gel. Those with the fewest number of repeated sequences travel the quickest. The gel contains "ladders," the steps of which marks the intervals at which the various alleles travel through the gel in a fixed time. The alleles are of discrete and fixed lengths. The fixed lengths of the different alleles are sufficiently different so that a match can be determined by visual comparison to the ladder. If the allele does not line up with a step on the ladder, no match is declared.

### A. *The Match Determination Method Used to Analyze the D1S80 Alleles Has Been Tested*

The expert testimony establishes that the electrophoresis process and ladder used to determine match for DS180 alleles has been extensively tested and determined to be reliable. The testimony of both experts is supported by the validation studies contained in Government Exhibit 122. The validation studies tested the ability of examiners to correctly identify matches based on this method. The 1996 NRC Report specifically recognized that its "value for forensic analysis has been validated in a number of tests (Sajantila et al.1992; Herrin et al.1994; Budowle, Baechtel, et al.1995; Cosso and Reynolds 1995). The locus consists of a 16–base unit that is repeated a variable number of times. There are more than 30 distinguishable alleles. The size classes are fully discrete, so usually each allele can be distinguished unambiguously" although sometimes there are ambiguous alleles which result in no match being able to be made. *Id.* at 72. Although defense counsel suggested through cross-examination that computer technology should be used to determine fragment length, Dr. Tracey testified unequivocally

that it was not necessary with respect to D1S80, due to the relatively large difference in length between the alleles. Dr. Tracey agreed that with respect to the interpretation of autorads, which are used in the RFLP process not involved in this case, that computer technology was essential to the determination of fragment length.

B. *The Match Determination Method Used to Analyze D1S80 Has Been Subjected to Peer Review and Publication*

The tests conducted to determined the validity and reliability of the eletrophoresis process and ladder method of determining D1S80 alleles has been published in peer-reviewed literature, some of which is contained in Government Exhibit 122. Other references are contained in the Reference Section of the FBI protocol. Neither Dr. Tracey nor SSA Smrz were aware of any published articles which found this method to be scientifically invalid.

C. *The Match Determination Method Used to Analyze D180 Has an Acceptable Rate of Error, and There are Standards Which Control the Technique's Operation*

The expert testimony establishes that the operation of this technique is performed according to a standard protocol. The FBI Protocol sets forth the standards to be used in determining a match using the D1S80 reference ladder.. (Government Exhibit 116, Section 8). The proficiency tests establish an acceptable rate of error, since in addition to determining the reliability of the sample processing, they necessarily also examine the accuracy of the match determination. In addition, as with the DQA1 and PM determinations, each examiner's conclusions in the FBI laboratory is independently confirmed by a second examiner.

D. *The Match Determination Method Used to Analyze D1S80 is Generally Accepted Within the Scientific Community*

The expert testimony establishes that the electrophoresis process and allelic reference ladder used to determine matches is generally accepted within the scientific community.

Neither expert was aware of any published literature which disputed the scientific validity of this method. Although not as widespread as DQA1 and PM, this method of determining genetic matches is also used by other laboratories, in addition to the FBI laboratory.

### RANDOM MATCH PROBABILITY

There are two determinations that must be made with respect to the calculation of the random match probability. First, the population databases must be scientifically valid. Second, the method used to calculate the frequencies must be scientifically valid. Dr. Tracey, a well-established expert in the field of population genetics, provided extensive testimony concerning the scientific validity of the random match probability calculated in this case. The Court finds that his testimony fully supports the calculations provided by SSA Melissa Smrz with respect to the use of the FBI's population database and the probability of selecting an unrelated individual at random who had the same DNA types as detected on the black bandanna. This probability is 1 in 6.1 million in the African American population.

A. *The Method for Determining the Random Match Probability Has Been Tested*

With respect to the population databases used by the FBI, Dr. Tracey testified that he was familiar with those databases, and that their validity had been tested by comparing the frequencies that appeared in those databases with other databases. Although there were slight variations between the databases, the frequencies were consistent and established that the FBI's databases contained a sufficient number of samples to determine the frequency of alleles appearing in the four populations which comprise the database— Caucasian, African American, Southeast Hispanic and Southwest Hispanic. In addition, he testified that tests had established that the genetic markers which were used in this case were independent of each other, and that the product rule could be used to determine the probability of a random match. That is, based upon well-established scientific

principles, the frequencies with which each of the identified alleles appeared in the relevant population could be multiplied together to obtain the frequency with which they would all appear in one individual in the relevant population. A factor known as "theta" is then applied to reduce this frequency where there are homozygous alleles. This is the method that SSA Smrz testified she used in this case. In addition, Dr. Tracey concurred with the recommendation in the 1996 NRC Report that the jury also be advised of the "confidence level," or margin of error of this frequency. That is, although in any given population of African Americans, the most likely frequency for the genetic profile found in this case is 1 in 6.1 million, in some populations, it could be a frequent as 1 in 600,000, or as rare as 1 in 61 million.

**B.** *The Method for Determining the Random Match Probability Has Been Subjected to Peer Review and Publication*

The expert testimony establishes that the tests conducted to determined the validity and reliability of the population databases used to calculate the random match probability, as well as the use of the product rule, have been published in peer-reviewed literature, some of which is contained in Government Exhibits 121 and 122. Other references are contained in the Reference Section of the FBI protocol. Neither expert was aware of any published articles which found this method to be scientifically invalid. The 1996 NRC Report specifically recommends that the product rule be used to calculate the DNA profile frequency. Recommendation 4.1.

**C.** *The Method for Determining Random Match Probability Has an Acceptable Rate of Error, and There are Standards Which Control this Determination*

To account for any possible variations between databases used in the frequency determinations, Dr. Tracey testified that he concurred with the NRC recommendation that a margin of error of ten percent be used. According to Dr. Tracey, this is a conservative estimate which would account for any differences in population databases. Dr. Tracey

also testified that the standards which are used to control the use of the product rule and to determine the adequacy of the population database are well established, and demonstrate that the alleles of each of the genetic markers are inherited from each parent independently of each other, and that each of the genetic markers used to comprise the genetic profile in this case (DQA1, the 5 PM loci, and D1S80), are inherited independently of each other.

**D.** *The Method for Determining Random Match Probability is Generally Accepted Within the Scientific Community*

The expert testimony establishes that the method for determining random match probability is generally accepted in the scientific community of population geneticists, although Dr. Tracey acknowledged that there was some disagreement over whether the margin of error correction was sufficient.

In concluding that the match probability analysis is in conformance with the *Daubert* standards, the Court finds persuasive that District Judge Barbadoro, in *United States v. Shea*, 957 F.Supp. 331 (D.N.H.1997), also addressed the concern over margin of error, accepted Dr. Tracey's testimony in this regard, and concluded that the probability of a random match, when adjusted in accordance with the 1996 NRC guidelines, satisfied the *Daubert* standard for admissibility. *Id.* at 342. In so doing, the district court noted specifically that *Daubert* did not require scientific consensus. *Id.* at 343.

## IV. CONCLUSION

In sum, the Court is satisfied that the Government has established the scientific validity, and thus the evidentiary reliability, of the tests and techniques employed in the PCR-based DNA analysis conducted in this case, as required by *Daubert*.

**WHEREFORE**, based on the foregoing reasons, it is hereby ORDERED:

1. The Government's motion to introduce PCR-based DNA analysis is GRANTED as set forth in this opinion; and,

2. The Defendants' motions to exclude such analysis are DENIED.

**ORDERED.**